**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| Ramos Tax & Services, Inc., | Case No. 26-CV-83 |
| Plaintiff, | |
| v. | |
| Victor Cosme Cruz; Innova Consulting, LLC | |
| Defendants. | |

**Complaint**

Plaintiff, Ramos Tax & Services, Inc., ("Ramos Tax") by and through its counsel, Patterson Law Firm, LLC, complains of Defendants, Victor Cosme Cruz and Innova Consulting, LLC ("Innova" and with Mr. Cosme Cruz, the "Defendants"), as follows:

**Parties**

1.   Ramos Tax is an Illinois corporation with its principal place of business located at 140 North Barrington Road, Suite 7, Streamwood, Illinois.

2.   Mr. Cosme Cruz is an individual residing at 303 Brett St., Belleville, Wisconsin.

3.   Innova is a Wisconsin LLC with its principal place of business of 658 S. Gammon Road, Madison, Wisconsin, whose sole member is, on information and belief, Mr. Cosme Cruz.

**Jurisdiction & Venue**

4.   This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there is complete diversity between the Plaintiff and the Defendants.

5.   Additionally, in accordance with 28 U.S.C. § 1332, the total amount in controversy exceeds $75,000.

6.   Venue is appropriate pursuant to 28 U.S.C. § 130(b) as the Defendants reside and/or are domiciled in Dane/Green counties, and the acts that form the basis of this action occurred in Dane/Green counties.

**Facts**

**I.   Ramos Tax's Business**

7.   Ramos Tax is a family owned and operated company that has been in business for over 27 years, providing tax preparation, accounting services, insurance services, and other business services for individuals and businesses.

8.   Ramos Tax has its main office in Streamwood, Illinois, with other offices in Elgin, Illinois, and Madison, Wisconsin.

9.   Ramos Tax provides tax preparation, bookkeeping, and related business services to individuals and businesses.

10. Over the course of its operations, Ramos Tax has expended substantial efforts and funds building a client base, many of whom have worked with Ramos Tax for many years.

## II.  Mr. Cosme Cruz's Relationship with Ramos Tax

11.  On or about November 11, 2020, Ramos Tax offered Mr. Cosme Cruz the position of Branch Office Manager, giving him local control of Ramos Tax's Madison office.

12. In addition to hourly compensation, Mr. Cosme Cruz was granted a share of the yearly profits of the Madison office.

13. Mr. Cosme Cruz's position was a full-time position.

14. Mr. Cosme Cruz and Ramos entered into an employment contract to memorialize the employment relationship. Ex. A.

15. Mr. Cosme Cruz agreed that "any business opportunity relating to or similar to the Employer's actual or reasonably anticipated business opportunities (with the exception of personal investments in less than 5% of the equity of a business, investments in established family businesses, real estate, or investments in stocks and bonds traded on public stock exchanges) coming to the attention of the Employee, is an opportunity belonging to the Employer. Therefore, the Employee will advise the Employer of the opportunity and cannot pursue the opportunity, directly or indirectly, without the written consent of the Employer." Ex. A, ¶20.

16. The contract provided that during the term of employment and two years after, Mr. Cosme Cruz would not "engage in any business that is in competition with the business of the Employer within any geographic area in or around 10-mile radius of any Ramos Tax & Services location." Ex. A, ¶23.

17. The contract provided that "during the term of Employee's employment with the Employer, and for two (2) years thereafter, the Employee will not provide, or assist anyone else in providing, any services provided by the Employer to any Customer of Employer that Employee knows to be a customer or to whom Employee provided services." Ex. A, ¶26.

18. In 2025, Mr. Cosme Cruz entered into an updated Non-Solicitation, Non-Compete, and Confidentiality Agreement ("2025 Agreement"). Ex. B.

19. This 2025 Agreement restricted Mr. Cosme Cruz, during his employment and one year after, from attempting "in any manner to solicit or accept business from any Restricted Client," rendering "services to or for any Restricted Client (except on behalf of Company during Employee's employment)," and engaging "in a Restricted Business either as an employee, agent or owner" in an area ten miles from the office of Ramos Tax.  Ex. B, ¶1.

**III.  Mr. Cosme Cruz's Schemes**

20. Mr. Cosme Cruz has engaged in a scheme to steal Ramos Tax's money, customers, and business, all while Mr. Cosme Cruz was the head of the Madison office.

21. Mr. Cosme Cruz engaged in this scheme individually, then formed Defendant Innova in 2024 to carry on this scheme.

22. The principal office of Innova, according to Innova's filing with the Wisconsin Department of Financial Institutions, was 658 S. Gammon Rd., Madison, which is Ramos Tax's Madison office.

23. Mr. Cosme Cruz was operating Innova out of Ramos Tax's Madison office.

24. Mr. Cosme Cruz diverted payments for services paid to Ramos Tax to Innova.

25. Mr. Cosme Cruz did this in numerous ways.

26. First, he charged clients via credit card payments directed to himself and/or Innova for work performed by Ramos Tax, even obtaining a credit card terminal from Chase Bank, which Ramos Tax does not use.

27. He created a Helcim virtual payment terminal linked to Innova, hiding the affiliation by using the D/B/A of RTS for Innova to make it appear as though payments were being made to Ramos Tax rather than Innova.

28. He even emailed clients a payment link from his Ramos Tax email account, for services provided by Ramos, which directed them to a Chase account owned by Innova or Mr. Cosme Cruz.

29. Therefore, Ramos Tax would perform the service, the client would pay by a credit card terminal or via a credit card link provided, but the funds would be diverted to Mr. Cosme Cruz or Innova.

30. This allowed him to collect funds for work performed by Ramos Tax.

31. He would also require clients to pay Innova directly for work performed by Ramos Tax, telling them to pay Innova.

32. Finally, Mr. Cosme Cruz stole cash and modified the books.

33. Mr. Cosme Cruz has deleted sales receipts of approximately $230,000 from Ramos Tax's QuickBooks.

34. He modified weekly cash receipts to reduce the amount of cash reported as received, allowing him to keep the remaining cash.

35. He also applied 100% discounts in Ramos Tax's systems for certain work performed by Ramos, avoiding any revenue expected, and collected the revenue through Innova.

36. Many examples of these schemes exist that were discovered in just a short period in fall 2025:

   a. One former employee's parent, a Ramos Tax client, hired Ramos Tax to perform their taxes, but was told by Mr. Cosme Cruz to pay Innova, which they did. They were issued a receipt by Mr. Cosme Cruz from Ramos Tax.

   b. For another client, Mr. Cosme Cruz prepared and filed tax returns (which he took on despite the fact that the appointment was assigned to a different Ramos Tax employee), applied a 100% discount, but collected the tax preparation fee through Innova's Chase bank account.

   c. He deleted a $500 cash transaction, which was entered by another employee, changing the record to claim that there was payment via another platform (which was false).

   d. He had numerous clients pay Innova for accounting services performed by Ramos.

   e. He received cash for $1,200 for one client, and Mr. Cosme Cruz told an employee not to create a receipt, allowing him to keep the cash without even deleting the entry.

f.  He worked on a tax return from a Ramos Tax client, and collected $3,750 for Innova.

37. Ultimately, Mr. Cosme Cruz's scheme resulted in the theft of cash from Ramos, charging clients for work performed by Ramos Tax, and diverting payments from Ramos Tax to Innova.

38. Always creative in his fraud, Mr. Cosme Cruz also purchased thousands of dollars in personal expenses using Ramos Tax's Amazon account (charged to Ramos Tax) including an outdoor storage shed, Callaway golf clubs, and even supplies for a Halloween party complete with a fog machine.

39. Finally, not willing to leave any money on the table, and apparently unsatisfied with the hundreds of thousands of dollars (at least) he stole, Mr. Cosme Cruz was stealing money from Ramos Tax by timecard fraud. He would work approximately three-hour days for Ramos Tax, yet submit weekly timesheets showing at least forty hours.

40. For example, on November 7, 2025, he did not show up at the office, did not log in, and did not clock in or out. But he edited his timecard to show work performed.

41. Ultimately, the result of Mr. Cosme Cruz's actions was the diversion of hundreds of thousands of dollars (at least) from Ramos Tax to himself and Innova.

42. Ramos Tax terminated Mr. Cosme Cruz as a result of the conduct described in this Complaint.

43. Mr. Cosme Cruz has since advertised that Innova was providing tax preparation, bookkeeping, and sales tax reporting, the same services as Ramos Tax offers.

## Count I- Breach of Fiduciary Duty (Mr. Cosme Cruz)

44. Ramos Tax reincorporates the allegations in paragraphs 1- 43 as if fully set forth herein.

45. Mr. Cosme Cruz was the branch manager for Ramos Tax's Madison office.

46. In this capacity, he had policy making authority in regard to that office equivalent to an officer, with the ability to hire, fire, schedule, make executive decisions, and otherwise manage the Madison office.

47. Mr. Cosme Cruz also was responsible for the books and recordkeeping of the Ramos Tax Madison office as the branch manager.

48. Mr. Cosme Cruz's responsibilities as branch manager were such that they could be used to harm Ramos Tax.

49. Mr. Cosme Cruz secretly engaged in competition with Ramos Tax while employed by Ramos Tax.

50. Mr. Cosme Cruz acted directly contrary to the interest of Ramos Tax by diverting revenue, taking fees earned by Ramos Tax, and billing clients under his own company, all while billing Ramos Tax for time he did not work.

51. Mr. Cosme Cruz owed a duty of loyalty to Ramos Tax.

52. Mr. Cosme Cruz breached this duty through the diversion and theft of revenue, taking the same for his own company rather than providing the same to Ramos Tax, and by his billing of Ramos Tax for time spent on his own ventures.

53. Ramos Tax was harmed by this diversion, resulting in the loss of at least hundreds of thousands of dollars.

54. Ramos Tax is entitled to disgorgement for the funds paid to him by Ramos Tax during his disloyalty.

55. In addition, as Mr. Cosme Cruz's actions were willful, wanton, intentional, and with actual malice, entitling Ramos Tax to punitive damages.

**Count II- Tortious Interference (Mr. Cosme Cruz and Innova)**

56. Ramos Tax reincorporates the allegations in paragraphs 1- 43 as if fully set forth herein.

57. Ramos Tax had an actual relationship, as well as a prospective relationship, with its customers.

58. Defendants interfered with this relationship in numerous ways.

59. By taking appointments made with Ramos Tax, and collecting the fees through Innova, he interfered with the relationship and contract between Ramos Tax and its customers.

60. By engaging in work through Innova while at Ramos Tax, and collecting the payments through Innova, he interfered with the relationship and contract between Ramos Tax and its customers.

61. Defendants, by diverting the revenue to himself and Innova from the client's payments for work which were performed by Ramos Tax employees, interfered with the relationship and contract between Ramos Tax and its customers.

62. Defendants' interference was intentional.

63. As a direct result of this interference, Ramos Tax was damaged through the loss of revenue.

64. Defendants were not privileged to interfere.

**Count III- Civil Theft (Wis. Stat. § 895.80) (Mr. Cosme Cruz and Innova)**

65. Ramos Tax reincorporates the allegations in paragraphs 1- 43 as if fully set forth herein.

66. Ramos Tax was damaged and suffered a loss as a result of intentional conduct by Defendants.

67. Defendants, by virtue of Mr. Cosme Cruz's role at Ramos Tax, which gave him custody and possession of money and payments of Ramos Tax, intentionally retained such assets with the intent to convert to their own use in violation of Wis. Stat. § 943.20.

68. They refused to deliver money in their possession to Ramos Tax.

69. Additionally, Mr. Cosme Cruz took possession of the items ordered from Amazon, which were rightfully those of Ramos Tax as they were paid by Ramos Tax, without Ramos Tax's consent and with the intent to deprive Ramos Tax permanently of possession of such property.

**Count IV- Conversion (Mr. Cosme Cruz and Innova)**

70. Ramos Tax reincorporates the allegations in paragraphs 1- 43 as if fully set forth herein.

71. Defendants intentionally took control of property belonging to Ramos Tax, without Ramos Tax's consent.

72. Defendants took control of cash paid to Ramos for work performed by Ramos Tax.

73. Defendants took control of payments which were intended to be made to Ramos Tax.

74. Defendants took control of Amazon items purchased through Ramos Tax's account using Ramos Tax's funds.

75. This resulted in serious interference with the rights of Ramos Tax to possess these funds.

**Count V- Breach of Contract- 2020 Contract (Mr. Cosme Cruz)**

76. Ramos Tax reincorporates the allegations in paragraphs 1- 43 as if fully set forth herein.

77. The contract contained in Exhibit A ("2020 Contract") is a valid contract.

78. Plaintiff performed its obligations under the 2020 Contract.

79. Mr. Cosme Cruz breached the 2020 Contract by usurping business opportunities, taking clients who booked appointments with Ramos Tax and clients whose work was performed by Ramos Tax, and receiving the

income himself and through Innova in violation of paragraph 19 of the 2020 Contract.

80. Mr. Cosme Cruz breached the 2020 Contract by operating a competing business *out of Ramos Tax's own office* in violation of paragraph 23.

81. Mr. Cosme Cruz breached the 2020 Contract by providing services to customers of Ramos Tax but collecting the funds himself in violation of paragraph 26.

82. As a result of these breaches, Ramos Tax was damaged through the loss of its revenue and harm in the relationships with its customers.

**Count VI- Breach of Contract- 2025 Contract (Mr. Cosme Cruz)**

83. Ramos Tax reincorporates the allegations in paragraphs 1- 43 as if fully set forth herein.

84. The contract contained in Exhibit B ("2025 Contract") is a valid contract.

85. Plaintiff performed its obligations under the 2025 Contract.

86. Mr. Cosme Cruz breached the agreement by performing work for restricted clients, accepting business restricted clients, and engaging work in a restricted business (including from Ramos Tax's own office), in violation of paragraph 1.

WHEREFORE, Plaintiff requests that this Court award damages, costs and attorneys' fees of litigation and investigation pursuant to Wis. Stat. 895.80, punitive damages, exemplary damages of not more than three

times the award under Wis. Stat. 895.80, require disgorgement of ill-gotten gains and the funds obtained during the period of breach of fiduciary duty, issue an injunction barring Defendants from soliciting Plaintiff's customers, soliciting employees, using Plaintiff's information, and competing within the area prohibited by the agreements, and to grant such other or further relief as this Court deems proper and just.

### Jury Demand

Plaintiff demands trial by jury of all issues so triable.

Respectfully submitted,

Dated: February 3, 2026

/s/Michael Haeberle
Michael Haeberle (Bar No. 1104367)
Patterson Law Firm LLC
200 W. Monroe Street, Ste 2025
Chicago, IL 60606
PH: (312) 223-1699
mhaeberle@pattersonlawfirm.com

# EXHIBIT A

# EMPLOYMENT CONTRACT

THIS EMPLOYMENT CONTRACT (this "Agreement") dated this **11th of November, 2020**

BETWEEN:

Ramos Tax & Services, Inc. of 140 N. Barrington Rd Unit 8

(the "Employer")

OF THE FIRST PART

- AND -

**Victor Cosme Cruz of 3107 Maple Grove DR, Madison, WI 53719 (the "Employee")**

OF THE SECOND PART

BACKGROUND:

A.      The Employer is of the opinion that the Employee has the necessary qualifications, experience and abilities to assist and benefit the Employer in its business.

B.      The Employer desires to employ the Employee and the Employee has agreed to accept and enter such employment upon the terms and conditions set out in this Agreement.

IN CONSIDERATION OF the matters described above and of the mutual benefits and obligations set forth in this Agreement, the receipt and sufficiency of which consideration is hereby acknowledged, the parties to this Agreement agree as follows:

Commencement Date and Term

1.      The Employee will commence **full-time hourly employment** with the Employer on the **23rd day of November, 2020 (the "Commencement Date").**

2.      The Employee must successfully complete a probationary period of ninety (90) days (the "Probationary Period") beginning on the Commencement Date. At any time during the Probationary Period, as permitted by law, the Employer will have the right to terminate employment without any notice or compensation to the Employee other than wages owed for hours of work already completed.

Job Title and Description

3.      The initial job title of the Employee will be the following: **Branch Office Manager**

4.      The Employee agrees to be employed on the terms and conditions set out in this Agreement. The Employee agrees to be subject to the general supervision of and act pursuant to the orders, advice and direction of the Employer.

5.      The Employee will perform any and all duties as requested by the Employer that are reasonable and that are customarily performed by a person holding a similar position in the industry or business of the Employer.

6.      The Employer may make changes to the job title or duties of the Employee where the changes would be considered reasonable for a similar position in the industry or business of the Employer. The Employee's job title or duties may be changed by agreement and with the approval of both the Employee and the Employer or after a notice period required under law.

7.      The Employee agrees to abide by the Employer's rules, regulations, policies and practices, including those concerning work schedules, vacation and sick leave, as they may from time to time be adopted or modified.

Employee Compensation

8.      Compensation paid to the Employee for the services rendered by the Employee as required by this Agreement (the "Compensation") will include a wage at the **rate of $22.00 per hour as well as a 15% of the Madison's office profits on a yearly basis.**

9.      This Compensation will be payable every week while this Agreement is in force. The Employer is entitled to deduct from the Employee's Compensation, or from any other compensation in whatever form, any applicable deductions and remittances as required by law.

10.     The Employee understands and agrees that any additional remuneration paid to the Employee in the form of bonuses or other similar incentive remuneration will rest in the sole discretion of the Employer and that the Employee will not earn or accrue any right to incentive remuneration by reason of the Employee's employment.

11.     The Employer will reimburse the Employee for all reasonable expenses, in accordance with the Employer's lawful policies as in effect from time to time, including but not limited to, any travel and entertainment expenses incurred by the Employee in connection with the business of the Employer. Expenses will be paid within a reasonable time after submission of acceptable supporting documentation.

Place of Work

12.     The Employee's primary place of work will be at one of our following locations:

- 140 N Barrington Rd 8, Streamwood, IL 60107
- 308 Dundee Ave, Elgin, IL 60120
- 658 S. Gammon Rd Ste 100, Madison, WI 53719

Time of Work

13.    However, the Employee will, on receiving reasonable notice from the Employer, work additional hours and/or hours outside of the Employee's Normal Hours of Work as deemed necessary by the Employer to meet the business needs of the Employer.

Employee Benefits

14.    The Employee will be entitled to only those additional benefits that are currently available as described in the provisions of the Employer's employment booklets, manuals, and policy documents or as required by law.

15.    Employer discretionary benefits are subject to change, without compensation, upon the Employer providing the Employee with 60 days written notice of that change and providing that any change to those benefits is taken generally with respect to other employees and does not single out the Employee.

Vacation

16.    The Employee will be entitled to three weeks of paid vacation each year during the term of this Agreement, or as entitled by law, whichever is greater, which vacation will accrue according to the Employer's policies.

17.    The times and dates for any vacation will be determined by mutual agreement between the Employer and the Employee.

18.    Upon termination of employment, the Employer will compensate the Employee for any accrued but unused vacation.

Duty to Devote Full Time

19.    The Employee agrees to devote efforts, as an employee of the Employer, to the employment duties and obligations as described in this Agreement.

Conflict of Interest

20.    During the term of the Employee's active employment with the Employer, it is understood and agreed that any business opportunity relating to or similar to the Employer's actual or reasonably anticipated business opportunities (with the exception of personal

investments in less than 5% of the equity of a business, investments in established family businesses, real estate, or investments in stocks and bonds traded on public stock exchanges) coming to the attention of the Employee, is an opportunity belonging to the Employer. Therefore, the Employee will advise the Employer of the opportunity and cannot pursue the opportunity, directly or indirectly, without the written consent of the Employer.

21.    During the term of the Employee's active employment with the Employer, the Employee will not, directly or indirectly, engage or participate in any other business activities that the Employer, in its reasonable discretion, determines to be in conflict with the best interests of the Employer without the written consent of the Employer.

Non-Competition

22.    (a) Employee acknowledges that the services Employee is to render to the Employer are of a special and unusual character with a unique value to the Employer. In that regard and (i) because of the Confidential Information (as defined below) to be obtained by or disclosed to Employee (including, but not limited to, client lists, business management expertise and techniques, and business plans and strategy), (ii) because of the expenditure of time and money in the training of Employee and the development of the business in which Employee, as an employee of the Employer, will engage, and (iii) in consideration of Employee's initial employment with the Employer and as an inducement for the Practice to employ Employee, Employee hereby covenants and agrees to the restrictions in this agreement.

23.(b) The Employee agrees that during the Employee's term of active employment with the Employer and for a period of two (2) years after the end of that term, the Employee will not, directly or indirectly, as employee, owner, sole proprietor, partner, director, member, consultant, agent, founder, co-venturer or otherwise, solely or jointly with others engage in any business that is in competition with the business of the Employer within any geographic area in or around 10  mile radius of any Ramos Tax & Services location., in which the Employer conducts its business, or give advice or lend credit, money or the Employee's reputation to any natural person or business entity engaged in a competing business in any geographic area in or around 10 mile radius of any Ramos Tax & Services location in which the Employer conducts its business,  For the purpose of this paragraph, a business in competition with Employer means a business that provides the following services: individual income tax preparation, business tax preparation, accounting services, notary services, immigration consulting services, insurance, or any other service that Employer offers at the time of cessation of employment.

Non-Solicitation

24.    The Employee understands and agrees that any attempt on the part of the Employee to induce other employees or contractors to leave the Employer's employ, or any effort by the

Employee to interfere with the Employer's relationship with its other employees and contractors would be harmful and damaging to the Employer. The Employee agrees that during the Employee's term of employment with the Employer and for a period of two (2) years after the end of that term, the Employee will not in any way, directly or indirectly:

a.      Induce or attempt to induce any employee or contractor of the Employer to quit employment or retainer with the Employer;

b.      Otherwise interfere with or disrupt the Employer's relationship with its employees and contractors;

c.      Discuss employment opportunities or provide information about competitive employment to any of the Employer's employees or contractors; or

d.      Solicit, entice, or hire away any employee or contractor of the Employer for the purpose of an employment opportunity that is in competition with the Employer.

25.     This non-solicitation obligation as described in this section will be limited to employees or contractors who were employees or contractors of the Employer during the period that the Employee was employed by the Employer.

26.     Employee also agrees that during the term of the Employee's employment with the Employer, and for two (2) years thereafter, the Employee will not provide, or assist anyone else in providing, any services provided by the Employer to any Customer of Employer that Employee knows to be a customer or to whom Employee provided services.

Confidential Information

27.     The Employee acknowledges that, in any position the Employee may hold, in and as a result of the Employee's employment by the Employer, the Employee will, or may, be making use of, acquiring or adding to information which is confidential to the Employer (the "Confidential Information") and the Confidential Information is the exclusive property of the Employer.

28.     The Confidential Information will include all data and information relating to the business and management of the Employer, including but not limited to, proprietary and trade secret technology and accounting records to which access is obtained by the Employee, including Work Product, Computer Software, Other Proprietary Data, Business Operations, Marketing and Development Operations, and Customer Information.

29.     The Confidential Information will also include any information that has been disclosed by a third party to the Employer and is governed by a non-disclosure agreement entered into between that third party and the Employer.

30.     The Confidential Information will not include information that:

a.      Is generally known in the industry of the Employer;

b.      Is now or subsequently becomes generally available to the public through no wrongful act of the Employee;

c.      Was rightfully in the possession of the Employee prior to the disclosure to the Employee by the Employer;

d.      Is independently created by the Employee without direct or indirect use of the Confidential Information; or

e.      The Employee rightfully obtains from a third party who has the right to transfer or disclose it.

31.     The Confidential Information will also not include anything developed or produced by the Employee during the Employee's term of employment with the Employer, including but not limited to, any intellectual property, process, design, development, creation, research, invention, know-how, trade name, trade-mark or copyright that:

a.      Was developed without the use of equipment, supplies, facility or Confidential Information of the Employer;

b.      Was developed entirely on the Employee's own time;

c.      Does not result from any work performed by the Employee for the Employer; and

d.      Does not relate to any actual or reasonably anticipated business opportunity of the Employer.

Duties and Obligations Concerning Confidential Information

32.     The Employee agrees that a material term of the Employee's contract with the Employer is to keep all Confidential Information absolutely confidential and protect its release from the public. The Employee agrees not to divulge, reveal, report or use, for any purpose, any of the Confidential Information which the Employee has obtained or which was disclosed to the Employee by the Employer as a result of the Employee's employment by the Employer. The Employee agrees that if there is any question as to such disclosure then the Employee will seek out senior management of the Employer prior to making any disclosure of the Employer's information that may be covered by this Agreement.  The following notice is provided under the Defend Trade Secrets Act: Limited exceptions apply for confidential reporting of suspected violations of the law under certain conditions. Please see the Defend Trade Secrets Act

Immunity Notice in the Handbook for further details concerning this immunity. This paragraph does not incorporate the Handbook into this Agreement.

33.    The Employee agrees and acknowledges that the Confidential Information is of a proprietary and confidential nature and that any disclosure of the Confidential Information to a third party in breach of this Agreement cannot be reasonably or adequately compensated for in money damages, would cause irreparable injury to Employer, would gravely affect the effective and successful conduct of the Employer's business and goodwill, and would be a material breach of this Agreement.

34.    The obligations to ensure and protect the confidentiality of the Confidential Information imposed on the Employee in this Agreement and any obligations to provide notice under this Agreement will survive the expiration or termination, as the case may be, of this Agreement and will continue for two (2) years from the date of such expiration or termination, except in the case of any Confidential Information which is a trade secret in which case those obligations will last indefinitely.

35.    The Employee may disclose any of the Confidential Information:

a.    To a third party where Employer has consented in writing to such disclosure; or

b.    To the extent required by law or by the request or requirement of any judicial, legislative, administrative or other governmental body after providing reasonable prior notice to the Employer.

36.    If the Employee loses or makes unauthorized disclosure of any of the Confidential Information, the Employee will immediately notify the Employer and take all reasonable steps necessary to retrieve the lost or improperly disclosed Confidential Information.

Ownership and Title to Confidential Information

37.    The Employee acknowledges and agrees that all rights, title and interest in any Confidential Information will remain the exclusive property of the Employer. Accordingly, the Employee specifically agrees and acknowledges that the Employee will have no interest in the Confidential Information, including, without limitation, no interest in know-how, copyright, trade-marks or trade names, notwithstanding the fact that the Employee may have created or contributed to the creation of the Confidential Information.

38.    The Employee waives any moral rights that the Employee may have with respect to the Confidential Information.

39.    The Employee agrees to immediately disclose to the Employer all Confidential Information developed in whole or in part by the Employee during the Employee's term of

employment with the Employer and to assign to the Employer any right, title or interest the Employee may have in the Confidential Information. The Employee agrees to execute any instruments and to do all other things reasonably requested by the Employer, both during and after the Employee's employment with the Employer, in order to vest more fully in the Employer all ownership rights in those items transferred by the Employee to the Employer.

Return of Confidential Information

40.     The Employee agrees that, upon request of the Employer or upon termination or expiration, as the case may be, of this employment, the Employee will turn over to the Employer all Confidential Information belonging to the Employer, including but not limited to, all documents, plans, specifications, disks or other computer media, as well as any duplicates or backups made of that Confidential Information in whatever form or media, in the possession or control of the Employee that:

a.     May contain or be derived from ideas, concepts, creations, or trade secrets and other proprietary and Confidential Information as defined in this Agreement; or

b.     Is connected with or derived from the Employee's employment with the Employer, including any information whatsoever relating to any of Employer's clients (whether Confidential Information or not).

Contract Binding Authority

41.     Notwithstanding any other term or condition expressed or implied in this Agreement to the contrary, the Employee will not have the authority to enter into any contracts or commitments for or on the behalf of the Employer without first obtaining the express written consent of the Employer.

Termination Due to Discontinuance of Business

42.     Notwithstanding any other term or condition expressed or implied in this Agreement, in the event that the Employer will discontinue operating its business at the location where the Employee is employed, then, at the Employer's sole option, and as permitted by law, this Agreement will terminate as of the last day of the month in which the Employer ceases operations at such location with the same force and effect as if such last day of the month were originally set as the Termination Date of this Agreement.

Termination of Employment

43.     Where there is just cause for termination, the Employer may terminate the Employee's employment without notice, as permitted by law.

44.     The Employee and the Employer agree that reasonable and sufficient notice of termination of employment by the Employer is the greater of two (2) weeks or any minimum notice required by law.

45.     If the Employee wishes to terminate this employment with the Employer, the Employee will provide the Employer with the greater of two (2) weeks and the minimum required by law. As an alternative, if the Employee co-operates with the training and development of a replacement, then sufficient notice is given if it is sufficient notice to allow the Employer to find and train the replacement.

46.     The Termination Date specified by either the Employee or the Employer may expire on any day of the month and following the Termination Date the Employer will pay to the Employee any outstanding portion of the compensation including any accrued vacation and banked time, if any, calculated to the Termination Date in such time as required by law.

47.     Once notice has been given by either party for any reason, the Employee and the Employer agree to execute their duties and obligations under this Agreement diligently and in good faith through to the end of the notice period.

Remedies

48.     In the event of a breach or threatened breach by the Employee of any of the provisions of this Agreement, the Employee agrees that the Employer is entitled to a permanent injunction, in addition to and not in limitation of any other rights and remedies available to the Employer at law or in equity, in order to prevent or restrain any such breach by the Employee or by the Employee's partners, agents, representatives, servants, employees, and/or any and all persons directly or indirectly acting for or with the Employee, without posting of any bond.

Severability

49.     The Employer and the Employee acknowledge that this Agreement is reasonable, valid and enforceable. However, if any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the parties' intent that such provision be changed in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

Notices

50.     Any notices, deliveries, requests, demands or other communications required here will be deemed to be completed when hand-delivered, delivered by agent, or seven (7) days after

being placed in the post, postage prepaid, to the parties at the following addresses or as the parties may later designate in writing:

- Employer:

Name:      Ramos Tax & Services, Inc.

Address:      140 N. Barrington Rd Unit 8

Fax:   (630) 504-0074

Email:      info@ramostax.com

- Employee:

Name:      **Victor Cosme Cruz**

Address:      **3107 Maple Grove Dr, Madison, WI 53719**

E-mail:      **victorcosme0601@gmail.com**

Modification of Agreement

51.      Any amendment or modification of this Agreement or additional obligation assumed by either party in connection with this Agreement will only be binding if evidenced in writing signed by each party or an authorized representative of each party.

Governing Law

52.      This Agreement will be construed in accordance with and governed by the laws of the state of Illinois.

Definitions

53.      For the purpose of this Agreement the following definitions will apply:

a.      'Overtime Hours' means the total hours worked in a day or week in excess of the maximum allowed, as defined by local statute, for a work day or a work week.

b.      'Work Product' means work product information, including but not limited to, work product resulting from or related to work or projects performed or to be performed for the Employer or for clients of the Employer, of any type or form in any stage of actual or anticipated research and development.

c.      'Computer Software' means computer software resulting from or related to work or projects performed or to be performed for the Employer or for clients of the Employer, of any type or form in any stage of actual or anticipated research and development, including but not

limited to, programs and program modules, routines and subroutines, processes, algorithms, design concepts, design specifications (design notes, annotations, documentation, flowcharts, coding sheets, and the like), source code, object code and load modules, programming, program patches and system designs.

d.      'Other Proprietary Data' means information relating to the Employer's proprietary rights prior to any public disclosure of such information, including but not limited to, the nature of the proprietary rights, production data, technical and engineering data, test data and test results, the status and details of research and development of products and services, and information regarding acquiring, protecting, enforcing and licensing proprietary rights (including patents, copyrights and trade secrets).

e.      'Business Operations' means operational information, including but not limited to, internal personnel and financial information, vendor names and other vendor information (including vendor characteristics, services and agreements), purchasing and internal cost information, internal services and operational manuals, and the manner and methods of conducting the Employer's business.

f.      'Marketing and Development Operations' means marketing and development information, including but not limited to, marketing and development plans, price and cost data, price and fee amounts, pricing and billing policies, quoting procedures, marketing techniques and methods of obtaining business, forecasts and forecast assumptions and volumes, and future plans and potential strategies of the Employer which have been or are being considered.

g.      'Customer Information' means customer information, including but not limited to, names of customers and their representatives, contracts and their contents and parties, customer services, data provided by customers and the specifics of the services received by customers of the Employer.

h.      'Termination Date' means the date specified in this Agreement or in a subsequent notice by either the Employee or the Employer to be the last day of employment under this Agreement. The parties acknowledge that various provisions of this Agreement will survive the Termination Date.

General Provisions

54.     Time is of the essence in this Agreement.

55.     Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

56.     No failure or delay by either party to this Agreement in exercising any power, right or privilege provided in this Agreement will operate as a waiver, nor will any single or partial exercise of such rights, powers or privileges preclude any further exercise of them or the exercise of any other right, power or privilege provided in this Agreement.

57.     This Agreement will inure to the benefit of and be binding upon the respective heirs, executors, administrators, successors and assigns, as the case may be, of the Employer and the Employee.

58.     This Agreement may be executed in counterparts. Facsimile signatures are binding and are considered to be original signatures.

59.     If, at the time of execution of this Agreement, there is a pre-existing employment agreement still in effect between the parties to this Agreement, then in consideration of and as a condition of the parties entering into this Agreement and other valuable consideration, the receipt and sufficiency of which consideration is acknowledged, this Agreement will supersede any and all pre-existing employment agreements between the Employer and the Employee. Any duties, obligations and liabilities still in effect from any pre-existing employment agreement are void and no longer enforceable after execution of this Agreement.

60.     This Agreement constitutes the entire agreement between the parties and there are no further items or provisions, either oral or written. The parties to this Agreement stipulate that neither of them has made any representations with respect to the subject matter of this Agreement except such representations as are specifically set forth in this Agreement.

61.     In the event of any breach or violation of any of the restrictions contained in this Agreement, the applicable period specified shall abate during the time of any violation thereof and that portion of the period remaining at the time of commencement of any violation shall not begin to run until such violation has been fully and finally cured.

62.     Employee agrees that (a) the covenants and restrictions contained in this Agreement are fair, reasonable and necessary for the protection of the Employer, and will not prevent Employee from earning a livelihood if they are enforced, (b) such covenants and restrictions relate to matters that are of special, unique and extraordinary character that give each such covenant and restriction a special, unique and extraordinary value, and (c) a breach of any of such covenant or restriction will result in irreparable harm and damages to the Employer that would be very difficult to determine and which cannot be adequately compensated by monetary award. Accordingly, the Employer, in addition to and not to the exclusion of any monetary award or other rights and remedies at law or in equity to which the Employer may be entitled, shall be entitled, without necessity of posting a bond or other security arrangement, to seek injunctive relief (temporary restraining order, preliminary injunction and

permanent injunction) and specific performance with respect to any actual or threatened breach by Employee of any such covenant in order to prevent or to restrain any such breach by Employee and/or any other person acting for, on behalf of, or with Employee.

63.     If Employee is found in breach of this Agreement in any proceeding, Employee will pay the Employer's costs and expenses of enforcement (including attorneys' fees), in addition to all other damages permitted by law.

64.     Employee agrees to indemnify and hold harmless Employer and its directors, officers, employees and agents from and against any claim, loss, damage, cost, expense (including reasonable attorneys' fees), or liability arising out of or related to the performance or nonperformance by Employee of any services to be performed or provided by Employee under this Agreement.


IN WITNESS WHEREOF, the parties have duly affixed their signatures under hand and seal on this **11th day of November, 2020.**

EMPLOYER:


_____

Ramos Tax & Services, Inc.



EMPLOYEE:

_____

Victor Cosme Cruz

# EXHIBIT B

## NON-SOLICITATION, NON-COMPETE AND CONFIDENTIALITY AGREEMENT

**This Non-Solicitation, Non-Compete and Confidentiality Agreement (the "Confidentiality Agreement")** is made by and among Ramos Tax and Services ("Company") and Victor A Cosme Cruz ("Employee"), effective as of the date of Employee's signature below (the "Effective Date").

**WHEREAS,** Employee is an at-will employee of Company's since 01/28/2020, and during his/her employment, has received certain training and Company investment in employee education from Company; and

**WHEREAS,** as an Employee of Company, Employee will continue to receive certain training and Company investment in employee education and professional development of Employee; and

**WHEREAS,** Employee will receive additional training and a payment of $100, among other consideration for signing this Confidentiality Agreement; and

**WHEREAS,** Employee as an employee of Company, he/she has access to Company's long-standing client and customer information; and

**WHEREAS,** Employee acknowledges that during their employment with Company, they have been and will continue to be privy to extremely sensitive, confidential, and valuable commercial information, which constitutes trade secrets belonging to Company, the disclosure of which information and secrets would greatly harm Company; and

**WHEREAS,** as a condition of Employee's employment, and as a reasonable measure to protect Company from the harm of disclosure and use of its information and trade secrets against it, and in consideration of the ongoing Company investment in Employee's education and professional development, Employee agrees to execute and abide by this Non-Solicitation and Confidentiality Agreement.

**NOW, THEREFORE,** for and in consideration of the above recitals, and Company's investment in Employee's education and training and employment of Employee and ongoing investment in Employee's professional development, the sufficiency of which is hereby acknowledged, Company and Employee agree as follows:

**1.    Definitions.**

"Restricted Client" means any client or customer who was or is a client or customer of Company during the twelve (12) months preceding Employee's employment and during Employee's employment with Company.

"Restricted Business" means any business that is the same or similar to, or competitive with, the business of the Company.

"Restricted Territory" means the ten (10) mile radius surrounding each Company office location.

"Restricted Activities" means directly or indirectly to:

Doc ID: 151e07724e602f88846b11a9fb6a202da915f8a2

(a) Attempt in any manner to solicit or accept business from any Restricted Clients, to persuade any Restricted Clients to cease to do business with Company, or to reduce the amount of business that any Restricted Client has customarily done or is reasonably expected to do with Company, whether or not the relationship between Employee and the Restricted Client was originally established in whole or in part through Employee's efforts; or

(b) Render services to or for any Restricted Client (except on behalf of Company during Employee's employment), in any capacity whatsoever.

(c) Engage in a Restricted Business either as an employee, agent or owner, either directly or indirectly in any manner, in the Restricted Territory.

"Restricted Period" means the term of Employee's employment with Company and a period of one (1) year immediately following the termination of Employee's employment with Company.

**2.    Covenant Not to Solicit; Covenant Not to Compete.**  As a reasonable measure to protect Company from the harm of disclosure and use of its information and trade secrets against it, Employee agrees that they shall not engage in any Restricted Activities during the Restricted Period.

**3.    Reasonable.** Employee acknowledges that the time limitation and the restriction on soliciting Company's clients for their own gain are reasonable in scope and are appropriate to protect the trade secrets and other protectable interests of Company. Employee further acknowledges and agrees that they have received adequate consideration, including Company's investment in Employee's education and training, for the restrictions described herein and that such restrictions will not prevent Employee from earning a living.

**4.    Enforcement.**  Employee acknowledges and agrees that any breach by Employee of any covenant herein will cause Company irreparable injury and damage and that Company shall therefore be entitled to, in addition to all other remedies available to it, injunctive and other equitable relief to prevent or stop such breach and to secure the enforcement of this commitment. Additionally, Company shall be entitled to collect from Employee its reasonable attorney fees incurred in connection with its enforcement of the provisions of this commitment. The Restricted Period shall be extended one day for each day of breach by Employee. Should a court of competent jurisdiction determine that the restrictions described herein are overly broad or otherwise unenforceable, in whole or in party, the parties agree that the court shall modify the restrictions to the minimum extent necessary to render the restrictions enforceable.

**5.  Confidentiality.**

During and after Employee's employment, Employee shall not disclose to any third party, or use for the benefit of Employee or any third party, any Confidential Information.  For purposes of this commitment, "Confidential Information" shall mean: (A) all trade secrets of Company, as that term is defined in the Wisconsin Uniform Trade Secrets Act; (B) all intellectual property of the Company, including but not limited to all inventions, discoveries, ideas or processes that have been or could be protected by patent, trademark, copyright or similar protections; (C) all

communications or information to or from counsel for any of the Company that constitute attorney work product or are protected by attorney-client privilege; and (D) all other non-public information concerning the business or operations of the Company, including but not limited to information concerning organization, management, finances, business plans and strategies, clients and customers, relationships with contractors and vendors, proprietary or specialized computer software, employees, products and services, equipment and systems, methods, processes and techniques, and prospective and executed contracts and other business arrangements.

In response to any subpoena, court order or other legal process purporting to require disclosure of Confidential Information, Employee shall: (A) immediately notify the Company; (B) take all lawful steps, at the Company's expense, to resist the subpoena, court order or other process unless otherwise directed by the Company; and (C) cooperate fully, at the Company's expense, with all lawful efforts by the Company to protect the Confidential Information from disclosure.

6.      **Severability of Provisions.** If any of the provisions of this Confidentiality Agreement shall be or become invalid or illegal under any provision of applicable law, the remainder of the Confidentiality Agreement shall not be affected thereby.

7.      **Entire Agreement / Effect of Agreement.** No warranties, representations, promises or agreements have been made between the parties other than as expressly herein set forth. This Confidentiality Agreement supersedes any and all agreements between the parties hereto and constitutes the entire agreement and understanding of the parties. Except for judicial modification as provided in Section 4, this Confidentiality Agreement can be amended or modified only by a writing signed by each of the parties.

8.      **Waiver.**  No waiver of any provision shall be deemed to have occurred unless memorialized in a writing signed by the waiving party.  If either party should waive any breach of any provision of this Confidentiality Agreement, such party will not thereby be deemed to have waived any preceding or succeeding breach of the same or any other provision of this Confidentiality Agreement.

9.      **Applicable Law; Venue.** This Confidentiality Agreement shall be governed by the laws of the State of Wisconsin, without regard to any state's principles regarding conflict of laws.

10.     **Binding Effect.** This Confidentiality Agreement shall be binding on and inure to the benefit of the parties hereto and their successors, assigns, and personal representatives and heirs; provided, however, that this Confidentiality Agreement shall not be assignable by Employee.

11.     **Titles and Headings.**  Titles and headings in this Confidentiality Agreement are for purpose of reference only and shall not limit, define or otherwise affect the provisions of this Confidentiality Agreement.

12.     **Counterparts.** This Confidentiality Agreement may be executed in counterparts, each of which need not contain signatures of more than one party, but all of which taken together will constitute one and the same Confidentiality Agreement. Electronic signatures shall be deemed as effective as original signatures.

***NOTHING IN THIS NON-SOLICITATION AND CONFIDENTIALITY AGREEMENT CHANGES EMPLOYEE'S STATUS AS AN AT-WILL EMPLOYEE.***

_(signature)_                                      10/02/2025

Ramos Tax and Services                          Date

_(signature)_                                      10 / 02 / 2025

Employee Name: Victor A. Cosme Cruz          Date

Doc ID: 151e07724e602f88846b11a9fb6a202da915f8a2

**Dropbox** Sign

| | |
|---|---|
| **Title** | Updated Employment Agreement |
| **File name** | Madison-Victor_Ra...NT_EMPLOYEES.docx |
| **Document ID** | 151e07724e602f88846b11a9fb6a202da915f8a2 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ⊙ Signed |

## Document History

| | | |
|---|---|---|
| ⟲ **SENT** | **10 / 01 / 2025** 21:47:24 UTC | Sent for signature to Victor A. Cosme Cruz (victor@ramostax.com) from jesus.cano@ramostax.com IP: 50.171.166.26 |
| ◉ **VIEWED** | **10 / 01 / 2025** 21:51:59 UTC | Viewed by Victor A. Cosme Cruz (victor@ramostax.com) IP: 104.28.50.169 |
| ⟍ **SIGNED** | **10 / 02 / 2025** 13:57:58 UTC | Signed by Victor A. Cosme Cruz (victor@ramostax.com) IP: 66.188.101.226 |
| ⟍ **COMPLETED** | **10 / 02 / 2025** 13:57:58 UTC | The document has been completed. |

Powered by **Dropbox** Sign